IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Randal Roy Mallory, | ) | OPINION |
| | ) | |
| Plaintiff and Appellant, | ) | Case No. 20100991-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Brigham Young University, Sarah | ) | (August 23, 2012) |
| Robinson, and Does I-X, | ) | |
| | ) | 2012 UT App 242 |
| Defendants and Appellees. | ) | |

-----

Fourth District, Provo Department, 090403834
The Honorable Claudia Laycock

Attorneys:    Curtis L. Wenger, Salt Lake City, for Appellant
              Steven M. Sandberg, Provo, for Appellee Brigham Young University

-----

Before Judges McHugh, Voros, and Christiansen.

McHUGH, Presiding Judge:

¶1    Randal Roy Mallory appeals from the trial court's order dismissing his First Amended Complaint (the Complaint) for lack of subject matter jurisdiction due to Mallory's failure to file a notice of claim under the Governmental Immunity Act of Utah (the GIAU).[1] *See* Utah Code Ann. § 63G-7-401 (2011).[2] Mallory contends that the trial

---

1. This case was filed in the Third District Court for Salt Lake County and later transferred to the Fourth District Court for Utah County. We use the term "trial court" to refer to the Fourth District Court.

2. The Governmental Immunity Act of Utah has been renumbered and amended since Mallory's cause of action arose in April 2008. Because there have been no substantive

(continued...)

court erred in concluding that the GIAU provides immunity to defendants, Brigham Young University (BYU) and Sarah Robinson (collectively, Defendants), and that the trial court exceeded its discretion by denying Mallory's motion to conduct additional discovery. We affirm in part, and reverse and remand in part, for further proceedings consistent with this opinion.


BACKGROUND[3]

¶2     On April 12, 2008, after a football game, Mallory was waiting on his motorcycle to enter a public street from a BYU parking lot.  Robinson, acting as a BYU traffic cadet, directed Mallory to make a left turn onto University Avenue.  Upon entering University Avenue, Mallory's motorcycle and an automobile driven by Vern Stratton collided.  Mallory suffered serious bodily injury and incurred economic damages as a result of the accident.

¶3     On July 13, 2009, Mallory filed the Complaint[4] in the Third Judicial District Court for Salt Lake County, alleging that BYU, Robinson, other unidentified "agent[s] and employee[s] of BYU," and Stratton acted negligently.[5]  On August 7, 2009, Defendants filed an answer to the Complaint that included the following affirmative defense:

> Plaintiff's claims are barred by Utah Code Title 63G, Chapter 7.  The Defendant Robinson was at all times pertinent to the Plaintiff's Complaint, an agent of Provo City, State of Utah.  No Notice of Claim has been filed with, nor served upon, Provo City, regarding the Plaintiff's claims.

¶4     With the answer, BYU filed a Motion for Change of Venue, seeking to have the case transferred to the Fourth District Court in Utah County.  In a supporting

---

2.  (...continued)
changes to the relevant code sections, we cite the current code for the convenience of the reader.

3.  We state the facts as set forth in the Complaint unless otherwise indicated.

4.  Mallory filed his initial complaint on February 17, 2009.

5.  Stratton, who was a named defendant in the Complaint, is not a party to this appeal.

memorandum, BYU argued that Utah County was more convenient because BYU is headquartered there, all the defendants reside there, and the accident occurred there. Mallory countered that some witnesses reside in Salt Lake County and also expressed concern that it would be difficult to find an unbiased jury in Utah County because of BYU's prominence there. However, Mallory did not provide any detail about the number of witnesses in Salt Lake County compared to the number in Utah County in his opposition papers. Relying on the briefing of the parties without argument, the Third District Court granted the change of venue. As a result, the matter was transferred to the Fourth District Court and assigned to Judge Claudia Laycock.

¶5    On February 12, 2010, Defendants filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (the Motion to Dismiss) under rule 12(b)(1) of the Utah Rules of Civil Procedure. In a supporting memorandum, they argued that the trial court lacked subject matter jurisdiction because Mallory had not filed a notice of claim as required by the GIAU. According to Defendants, a notice of claim was required to confer subject matter jurisdiction on the court because Robinson was acting as a servant or agent of Provo City at the time of the accident. In support of the Motion to Dismiss, Defendants filed an affidavit of a peace officer employed by BYU (Peace Officer). Peace Officer's affidavit indicated that the "University Police ha[d] been certified by the commissioner of the Department of Public Safety as a law enforcement agency according to the rules of the Department of Public Safety," and that Robinson was a trained traffic cadet who was directing traffic on Provo's public streets after a BYU football game.

¶6    In his opposition memorandum, Mallory argued that "the inclusion of facts outside the four corners of the [C]omplaint either require[d] a denial of [Defendants'] motion [to dismiss] or the motion must be treated as one for summary judgment."[6] In addition, Mallory requested that resolution of the Motion to Dismiss be deferred until after the completion of additional discovery as allowed by rule 56(f) of the Utah Rules of Civil Procedure. Finally, Mallory claimed that summary judgment was inappropriate, even in the absence of additional discovery, because there were material issues of disputed fact and because the Defendants were not entitled to judgment as a matter of law.

---

6. Mallory also claimed that Defendants had raised "an affirmative defense, like a qualified privilege, for the first time in [the] motion to dismiss." As noted previously, Defendants raised the absence of a notice of claim under the GIAU as an affirmative defense in the answer to the Complaint. *See supra* ¶ 3. Consequently, we do not address this argument further.

¶7     On March 29, 2010, Defendants filed a reply memorandum supporting their motion to dismiss, which was supported by a supplemental affidavit of Peace Officer. The supplemental affidavit indicated that Peace Officer was Robinson's supervisor and related details of his supervision of her on the night of the accident.

¶8     The trial court set oral argument on the motion to dismiss for May 10, 2010. The transcript from those proceedings indicates that Judge Laycock began with what she referred to as her "usual disclaimer on BYU cases." Judge Laycock provided a detailed account of her association with BYU, both as the daughter of a BYU orchestra conductor and as an alumna of its undergraduate and law schools, and further explained that any of the parties could move to disqualify her from presiding over the case. In response to Judge Laycock's disclosures, Mallory's counsel stated, "I certainly am perfectly comfortable with you on the bench," but indicated he would raise the issue with his client. However, he then asserted that he "certainly want[ed] to follow through with today's hearing." With that assurance, Judge Laycock entertained arguments on the motion, eventually taking the matter under advisement.

¶9     On July 2, 2010, the trial court entered a Memorandum Decision, Conclusions of Law, and Order on the Motion to Dismiss. First, the court rejected Mallory's argument that Defendants' reliance on matters outside the Complaint, including Peace Officer's affidavits, converted the motion into one for summary judgment or mandated that the court grant Mallory's rule 56(f) motion for additional discovery. The trial court then concluded that "[b]ecause Robinson was directing traffic under color of Provo City's authority, she is an employee of Provo City who is entitled to governmental immunity under the [GIAU]." Consequently, the trial court ruled that Mallory's failure to file a notice of claim as required by the GIAU "strip[ped it] of subject matter jurisdiction." On October 25, 2010, the trial court entered an Order and Final Judgment dismissing the claims against Defendants for lack of subject matter jurisdiction. Mallory filed a timely appeal.

ISSUES AND STANDARDS OF REVIEW

¶10     On appeal, Mallory challenges the trial court's denial of his rule 56(f) motion for additional discovery. "To the extent this issue requires us to interpret rules of civil procedure, it 'presents a question of law which we review for correctness.'" *Harris v. IES Assocs., Inc.*, 2003 UT App 112 , ¶ 25, 69 P.3d 297 (quoting *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 42, 989 P.2d 1077). We review the trial court's denial of a request for additional discovery under rule 56(f) of those rules for an abuse of discretion, and will "overturn it only if the denial of the motion exceed[s] the limits of

reasonability." *See Petersen v. Riverton City*, 2010 UT 58, ¶ 25, 243 P.3d 1261 (alteration in original) (internal quotation marks omitted).

¶11     In addition, Mallory argues that the trial court erred in granting Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction. "Compliance with the [Utah Governmental] Immunity Act is a prerequisite to vesting a district court with subject matter jurisdiction over claims against governmental entities. Accordingly, a district court's dismissal of a case based on governmental immunity is a determination of law that we afford no deference." *Wheeler v. McPherson*, 2002 UT 16, ¶ 9, 40 P.3d 632 (citations omitted) (interpreting the Utah Governmental Immunity Act (the UGIA), the predecessor statute to the GIAU).

¶12     Finally, Mallory contends that the Third District Court erred when it granted BYU's request for a change of venue. "Absent a clear abuse of discretion, we will not disturb a trial court's ruling on a motion to change venue. We will reverse such a decision only if it exceeds the bounds of reasonability." *U.S. Bank Nat'l Ass'n v. HMA, LC*, 2007 UT 40, ¶ 30, 169 P.3d 433 (internal quotation marks omitted).


ANALYSIS

I. The Motion to Dismiss Was Not Converted to a Motion for Summary Judgment.

¶13     Mallory argues that, by relying on facts not set forth in the Complaint, Defendants converted the motion to dismiss for lack of subject matter jurisdiction under rule 12(b)(1) to one for summary judgment under rule 56. *See generally* Utah R. Civ. P. 12(b)(1) (motion to dismiss for lack of subject matter jurisdiction); *id.* R. 56 (motion for summary judgment). Rule 12(b) provides that if, in a rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *See generally id.* R. 12(b). Mallory claims that Defendants relied on matters outside the pleadings and that, therefore, he was entitled to conduct additional discovery pursuant to rule 56(f). *See id.* R. 56(f) (motion for further discovery). The Utah Supreme Court has previously rejected this argument.

¶14     In *Spoons v. Lewis*, 1999 UT 82, 987 P.2d 36, a plaintiff sued a district court judge without first filing a notice of claim under the predecessor of the GIAU, the UGIA. *See id.* ¶ 1; *see also* Utah Code Ann. §§ 63-30-11 to -13 (1997) (current version at *id.* §§ 63G-7-401 to -403 (2011)). In response, the judge filed a motion to dismiss for lack of subject matter jurisdiction supported by affidavits asserting facts not contained in the

Complaint.  *See Spoons*, 1999 UT 82, ¶ 1.  The trial court granted the judge's motion to dismiss and the plaintiff appealed, claiming that reliance on the affidavit converted the motion to one for summary judgment.  *See id.* ¶¶ 1, 3.  The supreme court disagreed, explaining that "[r]ule 12 . . . does not convert motions based on subsections (b)(1) through (5) . . . into motions for summary judgment simply because they include some affirmative evidence relating to the basis for the motion."  *See id.* ¶ 5; *see also Wheeler* 2002 UT 16, ¶ 20 (holding that reliance on affidavits in support of a rule 12(b)(1) motion based on the plaintiffs' failure to file a notice of claim under the UGIA did not convert the motion to one for summary judgment).

¶15    Because Defendants' motion to dismiss was based on lack of subject matter jurisdiction under rule 12(b)(1), it was not converted to a summary judgment motion when Defendants filed the affidavits.  *See Spoons*, 1999 UT 82, ¶ 5.  Thus, the provisions of rule 12 providing for the conversion to a summary judgment motion are inapplicable, as are the provisions of rule 56(f).  *See* Utah R. Civ. P. 12; *id.* R. 56(f); *see also Wheeler*, 2002 UT 16, ¶ 20.

¶16    Nevertheless, uncertainty as to the facts relevant to assessing the court's subject matter jurisdiction will make it inappropriate to grant a motion to dismiss under rule 12(b)(1).  Although the supreme court rejected Spoon's argument that the motion to dismiss had been converted to a summary judgment, it reversed the dismissal of Spoon's complaint.  *See Spoons*, 1999 UT 82, ¶ 7.  The supreme court explained that the complaint alleged generally that the judge had engaged in a conspiracy but did not include enough factual detail to determine the context in which the judge allegedly did so.  *See id.*  It concluded that the dismissal was premature because, if the plaintiff

> can maintain any viable claims that [the judge] engaged in a
> conspiracy occurring outside the performance of her duties,
> not within the scope of her employment, and not under color
> of authority, the [UGIA's] notice of claim provisions would
> not apply.  In such a case, the district court would have
> jurisdiction to entertain the suit.

*Id.*  Here, Mallory argues that Defendants are not protected by the GIAU and that, therefore, the trial court has subject matter jurisdiction over his claims.  On appeal, we must decide whether the trial court correctly concluded that the facts alleged in the Complaint, together with the affidavits, establish that Defendants were protected by the GIAU, including its notice of claim requirements.

   II. Agents Must Be Under the Significant Control of a Governmental Entity to Be

Entitled to GIAU Immunity.

¶17      When interpreting this state's statutes, our goal is to give effect to the intent of the Utah Legislature. *See Harold Selman, Inc. v. Box Elder Cnty.*, 2011 UT 18, ¶ 18, 251 P.3d 804. To discern that intent, we begin by examining the plain language of the statute at issue. *See id.*; *see also State v. Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780. If that language, interpreted "in light of its linguistic, structural, and statutory context," is clear, we apply the statute accordingly. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. "'[S]tatutory construction presumes that the expression of one should be interpreted as the exclusion of another. Thus, we should give effect to any omission in the [statutory] language by presuming that the omission is purposeful.'" *State v. Houston*, 2011 UT App 350, ¶ 12, 263 P.3d 1226 (quoting *Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 30, 104 P.3d 1208).

¶18      Utah Code section 63G-7-201 provides, "Except as may be otherwise provided in this chapter, each governmental entity *and each [E]mployee of a governmental entity* are immune from suit for any injury that results from the exercise of a governmental function."[7] Utah Code Ann. § 63G-7-201(1) (Supp. 2012) (emphasis added). Thus, this section of the GIAU plainly states that to fall within the scope of the GIAU, an individual must be an "[E]mployee of a governmental entity" engaged in a "governmental function." *Id.*

¶19      While Mallory concedes that "traffic direction on public roads is a governmental function," he disputes that the "authorization to perform a governmental function makes the actor an agent of the government granting the authorization," and he further challenges the assumption that "[a]ll agents are automatically [E]mployees of the authorizing government under the [GIAU]." In contrast, Defendants assert that the trial court correctly concluded that they are Employees of Provo City. They first note that BYU is a corporation and "can only act through [its] agents, be they officers or employees." *See Orlob v. Wasatch Mgmt.*, 2001 UT App 287, ¶ 18, 33 P.3d 1078 (internal quotation marks omitted). Next, they contend that because Robinson, as an employee of BYU, was authorized by ordinance to direct post-event traffic, they are both entitled to immunity based on the Provo City ordinance. *See* Provo City, Utah, Code

---

7. The term "Employee," as defined in the GIAU, is broader than the common meaning of employee, and includes "a governmental entity's officers, employees, servants, trustees, or commissioners," regardless of whether or not those positions are paid. *See* Utah Code Ann. § 63G-7-102(2) (2011). For the convenience of the reader, when referring to the term as used in the GIAU, we use "Employee," and when referring to the common meaning of the term, we use "employee."

§ 9.10.060(2)-(3) (2012). In particular, Defendants argue that they were acting as servants or agents of Provo City. *See* Utah Code Ann. § 63G-7-102(2)(a)(i), -201(1) (2011 & Supp. 2012) (granting immunity from suit to government Employees, including "servants," when performing a "governmental function").

¶20   To determine whether Defendants are Employees of Provo City, "we must read the plain language of the [definition section of the GIAU] as a whole" and "construe [its] provisions in harmony with other provisions in the [GIAU]." *See Archuleta v. St. Mark's Hosp.*, 2009 UT 36, ¶ 8, 238 P.3d 1044 (internal quotation marks omitted). Section 63G-7-201 provides immunity to a governmental entity and its Employees for "any injury that results from the exercise of a governmental function." *See* Utah Code Ann. § 63G-7-201(1). In turn, a "governmental function" is defined as "each activity, undertaking, or operation performed by a department, agency, employee, *agent*, or officer of a governmental entity." *See id.* § 63G-7-102(4)(b) (emphasis added). Thus, the scope of immunity provided under the GIAU explicitly includes protection to a governmental entity and its Employees for claims arising out of the acts of the entity's agents. However, the only individuals entitled to assert that immunity are those who are classified as a governmental entity's Employees. *See id.* § 63G-7-102(2)(a), -201(1) (providing that "each governmental entity and each [E]mployee of a governmental entity are immune from suit"). The definition section of the GIAU provides in relevant part, "'Employee' *includes*: . . . a governmental entity's officers, employees, *servants*, trustees, or commissioners . . . whether or not the individual holding that position receives compensation." *Id*. § 63G-7-102(2)(a), (b) (emphases added). And the statute further indicates that "'Employee' does not include an independent contractor." *Id.* § 63G-7-102(2)(c).

¶21   Although the Utah Legislature did not expressly list "agent" as an example of an "Employee" who is entitled to immunity, Defendants ask us to assume that the Utah Legislature inadvertently omitted that term and intended to grant immunity to both servants and all other agents. *Compare id.* § 63G-7-102(2) (listing who may qualify as an Employee under the GIAU), *with id.* § 63G-7-104(4)(b) (providing that governmental functions include acts performed by a governmental entity's agents), *and id.* § 63G-7-201(1) (providing immunity to governmental entities and Employees for injuries resulting from "the exercise of a governmental function"). They contend that the legislature's use of the word "includes" in the definition of "Employee" indicates that the list provided is not exclusive. *See, e.g., Boyle v. Christensen*, 2011 UT 20, ¶ 27, 251 P.3d 810 ("When 'including' precedes a list, its common usage is to indicate a partial list." (citing *Black's Law Dictionary* 777-78 (8th ed. 2004))). While the use of "includes" does generally indicate a nonexhaustive list, it does not justify adding terms that are "inconsistent with the manifest intent of the Legislature" or "repugnant to the context of

the statute."  *See* Utah Code Ann. § 68-3-12 (1)(a), (f) (2011).  Thus, we must "look to the reason, spirit, and sense of the legislation, as indicated by the entire context and subject matter of the statute" when we consider whether such a contrary intent is evident here. *See In re Marriage of Gonzalez*, 2000 UT 28, ¶ 23, 1 P.3d 1074 (internal quotation marks omitted).  In doing so, we do not lightly assume that the legislature overlooked "agents" when listing examples of governmental Employees, but remembered to include it in the definition of governmental function located in the same section of the GIAU.  *Compare* Utah Code Ann. § 63G-7-102(2)(a) (defining "Employee"), *with id.* § 63G-7-102(4)(b) (defining "[g]overnmental function").  Rather, we begin with the assumption that the different terms were used advisedly.  *See Due South, Inc. v. Department of Alcoholic Beverage Control*, 2008 UT 71 , ¶ 33, 197 P.3d 82.

¶22    The only listed category of Employee upon which Defendants rely is "servants." *See* Utah Code Ann. § 63G-7-102(2)(a).  In addition, they contend that as Provo City's agents for traffic direction, they are immune by implication even if they do not fall within an express category of Employees.  To determine whether the GIAU includes all agents as Employees, we first compare the reach of the statute if only servants of a governmental entity are included as Employees to its reach if all agents are also entitled to immunity.  Second, we review whether any limitation created by including only servants is consistent with the legislative purpose of the GIAU.  Finally, we interpret the GIAU consistent with that purpose to determine whether the trial court was correct in dismissing the Complaint.

A.  The Difference Between Servants and Agents

¶23    The Utah Supreme Court has long recognized that "a servant is defined as a 'person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control.'"  *Dowsett v. Dowsett*, 116 Utah 12, 207 P.2d 809, 811 (1949) (quoting Restatement (First) of Agency § 220 (1933)); *see also Black's Law Dictionary* 1490-92 (9th ed. 2009) (defining servant as "[a] person who is employed by another to do work under the control and direction of the employer").  Servants include both employees and "agents with limited powers."  *See Intermountain Speedways, Inc. v. Industrial Comm'n*, 101 Utah 573, 126 P.2d 22, 24 (1942); *see also Black's Law Dictionary* 602 (9th ed. 2009) (defining employee as "[a] person who works in the service of . . . the employer[] under an express or implied contract for hire, under which the employer has the right to control the details of work performance").  Accordingly, if Defendants were acting under the control and direction of Provo City, they are agents of the city acting as its servants and are expressly covered by the GIAU.

¶24   The term "agent" is susceptible to both a broad and narrow meaning.  Under its expansive definition, "agent" can be used generally to refer to "[o]ne who is authorized to act for or in place of another; a representative."  *Black's Law Dictionary* 72 (9th ed. 2009); *see also* Restatement (Third) of Agency § 1.01 cmt. b (2006) (noting that "agency" is often used in a broad sense to include "parties who serve any intermediary function").  This use of the term covers a broad spectrum of relationships, ranging from those where the principal maintains strict control to those where the agent has significant discretion.  *See* Restatement (Third) of Agency § 1.01 cmt. c (2006) ("[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment.").  "'An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency'" is an independent contractor.  *See Dowsett*, 207 P.2d at 811 (emphasis omitted) (quoting Restatement (First) of Agency § 220 cmt. c (1933)).  When agency is used in its broadest sense, independent contractors are agents.  Thus, if BYU and Provo were authorized to act for Provo City, they are its agents in this broad sense.

¶25   However, in a more technical sense, an agency relationship requires that a person is "authorized by another to act on his behalf and subject to his control" and a "manifestation of consent to create an agency relationship."  *See Stamper v. Johnson*, 2010 UT 26, ¶ 18, 232 P.3d 514 (internal quotation marks omitted)); *see also* Restatement (Third) of Agency § 1.01 (2006) (defining agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act").  When the term "agent" is used in this strict legal sense, i.e., to denote a "true agency," the definition excludes relationships that allow one person to act on behalf of another, where "one or more of the defining elements of agency are not present."  Restatement (Third) of Agency § 1.01 cmt. b (2006).  Thus, under this more restrictive definition, an agent must be subject to the control of the principal, and an independent contractor is not an agent.  Under this definition, Defendants are only agents if they were subject to Provo City's control and agreed to its request that they act on the city's behalf.

¶26   In summary, when used in its broad sense, the term agent can include all persons acting on behalf of a governmental entity, from servants, on the closely controlled side of the spectrum, to independent contractors, on the other extreme.  Our review of the GIAU convinces us that the Utah Legislature did not intend to extend immunity to all agents of a governmental entity under this expansive definition.

B.  The Use of the Terms "Servant" and "Agent" in the GIAU

¶27     By listing "servants" and "employees" as examples of the types of individuals who may invoke the protections of the GIAU, but excluding "independent contractors," the Utah Legislature has narrowed the applicability of the GIAU's individual immunity to a subset of the more expansive definition of agent. *See* Utah Code Ann. § 63G-7-102(2)(a)(i), (2)(c) (2011). The difference between those individuals expressly included as Employees and those explicitly excluded is the extent of the governmental entity's control. Where the entity can exercise the level of control to create a servant or employee relationship, the individual is entitled to the protection of the GIAU. *Cf. Dowsett*, 207 P.2d at 811. But if the governmental entity does not retain control over the manner of performance, the individual is an independent contractor not entitled to immunity under the GIAU. *Cf. id.* Accordingly, the plain language of the GIAU includes some, but not all, broadly defined agents as Employees.

¶28     While Defendants are correct that the GIAU defines governmental function as including the acts of all "agent[s]" of a governmental entity, the omission of that term in the definition of "Employee" does not indicate an oversight by the Utah Legislature. *See* Utah Code Ann. § 63G-7-102(2), (4)(b). Rather, the Legislature has simply defined the scope of immunity under the GIAU more expansively than the group of individuals who are protected by that immunity. While only individuals under the supervision of the governmental entity are Employees who enjoy immunity, those Employees are "immune from suit for any injury that results from" their own activities and the actions of any agent of a governmental entity. *See id*. § 63G-7-201 (Supp. 2012); *see also id.* § 63G-7-102(4)(b) (2011) (defining "[g]overnmental function" as "each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity"). This means that although an agent over whom the entity does not exercise sufficient control to create a master-servant relationship, such as an independent contractor, may be sued, the plaintiff cannot bring claims against the governmental entity or its Employees as a result of that individual's conduct.

¶29     In the absence of immunity, a principal can be sued for direct or vicarious liability as a result of the actions of its agent. *See* Restatement (Third) of Agency § 7.03 (2006) (listing the requirements for direct and vicarious liability). Furthermore, direct liability can arise "either from the principal's relationship with an agent whose conduct harms a third party or from the agent's failure to perform a duty owed by the principal to the third party." *Id.* § 7.03 cmt. b. Direct liability can also arise from the principal's own negligence in selecting or supervising the agent. *See id.* In turn, the principal is subject to vicarious liability when its true agent "commits a tort while acting within the scope of employment." *See id.* § 7.03(2)(a); *see also Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 36, 63 P.3d 686 ("'A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.'" (quoting Restatement

(Second) of Agency § 219 (1958))).  By including the acts of a governmental entity's "agents" within the definition of "governmental function," the GIAU provides immunity from all of these claims.  *See* Utah Code Ann. §§ 63G-7-102(4)(b), -201(1).  However, to be individually protected by the GIAU, the agent must be sufficiently under the control of the governmental entity to qualify as its servant.  *See id.* § 63G-7-102(2).  This distinction is consistent with the purpose of the GIAU.

¶30     By enacting the GIAU and its predecessor, the UGIA, "the 'legislature has recognized the necessity of immunity as essential to the protection of [governmental entities] in rendering the many and ever increasing number of governmental services.'"  *See Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 14, 24 P.3d 958 (quoting *Epting v. State*, 546 P.2d 242, 243 (Utah 1976)) (discussing the UGIA specifically and sovereign immunity generally).  Affording a governmental entity immunity for the acts of its agents generally advances this purpose by protecting its resources for the provision of services to the community.  *See generally Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 32, 116 P.3d 295 (recognizing the preservation of "the treasuries of the state and its political subdivisions" as a "legitimate governmental purpose" under the GIAU).  However, extending immunity to an agent acting on behalf of the governmental entity, but not under its control, does not.  Unlike the governmental entity, the independent contractor's assets will not be used to provide public services if not paid in damages.  Consequently, barring suit against the independent agent does not further this goal of the GIAU.

¶31     In turn, the purpose of granting immunity to individuals acting in an official capacity "is to avoid making 'public officials unduly fearful in their exercise of [discretionary] authority and discourag[ing] them from taking prompt and decisive action.'"  *Lyon v. Burton*, 2000 UT 19, ¶ 44, 5 P.3d 616 (alterations in original) (quoting George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum. L. Rev. 1175, 1178 (1977)), *as modified by denial of rehearing*, 2000 UT 55.  Furthermore, governmental entities, like corporations, can only act through individuals.  By adding "servants" to the group of persons individually covered by the GIAU, the Utah Legislature has extended immunity to the individuals acting under the direction of the governmental entity who do not meet the traditional definition of an employee.  As a result, both employees and servants are able to act according to the entity's direction without fear of being sued.  In contrast, an agent acting on behalf of the governmental entity, but not under its direction, is free to make its own decisions concerning the performance of the task.  If the agent's independent decisions result in injury to a third party, allowing the agent to assert immunity does not advance the governmental entity's interest in assuring that individuals will carry out the directives of governmental entities.

¶32    For these reasons, we are convinced that the Utah Legislature carefully selected the terms it used to define the individuals entitled to protection and the extent of the immunity granted to them. While the immunity granted to Employees of a governmental entity is broad enough to insulate the governmental entity and the individuals through whom it acts from claims arising from the acts of all agents of the entity, that immunity is not available to every agent in the broadest definition of that term. Instead, agents not acting under the direction of the governmental entity can be sued for their independent decisions. Because we conclude that this distinction is consistent with the purposes of governmental immunity and the plain language of the GIAU, we reject Defendants' suggestion that the legislature inadvertently omitted the term agents from the definition of Employee. Instead, the GIAU provides that agents who are also servants due to the level of control the entity retains over their performance are Employees, while agents who are only independent contractors are not.

¶33    While our conclusion that the plain language of the statute itself negates the need to consider the legislative history of the GIAU, *see State v. MacGuire*, 2004 UT 4, ¶ 15, 84 P.3d 1171, it also suggests that the Utah Legislature thoughtfully differentiated between persons entitled to immunity and the scope of that protection. The predecessor to the GIAU was originally codified in 1965.[8] The act's original definition of Employee was "any officer, employee or servant of a governmental entity." *See* Utah Code Ann. § 63-30-2(4) (1968). Since then, the legislature has amended the act's definition of Employee several times but has not added "agent," a term used in other provisions of the same section of the act. Indeed, when a definition of "governmental function" was added in 1987, providing that such a function could "be performed by any department, agency, employee, *agent*, or officer of a governmental entity," *see id.* § 63-30-2(4)(b) (1989)

---

8. At common law, "government employees in this state were personally liable for civil wrongs committed in a ministerial or operational capacity." *See Lyon v. Burton*, 2000 UT 19, ¶ 45, 5 P.3d 616. The UGIA, first adopted in 1965, codified the common law rule but provided that the governmental entity could purchase insurance for its employees. *See id.* ¶ 50. In subsequent versions of the UGIA and the current GIAU, the Utah Legislature extended the protection of the act to governmental employees. *See, e.g.,* Utah Code Ann. § 63-30-4 (1993) (granting personal immunity to governmental Employees for negligence in the course and scope of their employment); Utah Code Ann. § 63G-7-201 (Supp. 2012) (providing immunity to "each [E]mployee of a governmental entity . . . for any injury that results from the exercise of a governmental function").

(emphasis added), the legislature did not add "agent" to the list of individuals expressly included as an Employee of a governmental entity.

¶34    In 2004, the legislature conducted a comprehensive overhaul of the immunity act, repealing and reenacting it. *See generally Jenkins v. Jordan Valley Water Conservancy Dist.*, 2012 UT App 204, ¶ 84, 713 Utah Adv. Rep. 37. In so doing, it noted in the Senate Journal that the revision was an "effort to completely repeal, rethink, reorganize and then enact a new Governmental Immunity Act." Senate Journal, Gen. Sess. Day 38, at 10 (Utah Feb. 25, 2004). The revision was the result of "hundreds of hours" of meetings and drafting. *See id.* at 11. Again, however, the Utah Legislature did not add the term "agents" to the express list of Employees. *See* Utah Code Ann. § 63-30d-102(2) (2004).[9] In light of this careful and extensive review of governmental immunity, we are further convinced that the Utah Legislature intentionally omitted the generic term "agents" from the definition of "Employee." Rather than exhibiting inadvertence, the express exclusion of "independent contractors" and the omission of "agents" suggest that the Utah Legislature was aware of the imprecision in the use of the term "agent" and carefully selected language designed to limit immunity to those relationships where the governmental entity exercises control over the manner in which the work is performed.

C. Application of the GIAU to Defendants

¶35    Defendants assert that because Robinson was authorized as a BYU employee to direct post-event traffic, she and BYU were acting as agents of Provo City. *See* Provo City, Utah, Code § 9.10.060 (2012) (allowing "a person who is employed by a college or university" to "direct [post-event] traffic on public streets while under the supervision of a peace officer employed by the same college or university"). As discussed, however, an agency relationship alone is not enough to establish the applicability of the GIAU and the correctness of the trial court's dismissal of the Complaint for lack of subject matter jurisdiction. Instead, the determination of whether the GIAU applies is dependent on the degree of control Provo City maintained over Defendants' traffic control activities. For example, the indicia of a master-servant relationship include the "right to discharge" the individual, the "nature of [the] work," and whether the relationship is "for a definite piece of work." *See Intermountain Speedways, Inc. v. Industrial Comm'n*, 101 Utah 573, 126 P.2d 22, 24 (1942). The most important consideration, however, is the ability to control the "means and method of performance." *Id.* "'Those rendering service but retaining control over the manner of

_____

9. The GIAU was again renumbered in 2008 as Utah Code sections 63G-7-101 to -904. *See* Utah Code Ann. §§ 63G-7-101 to -904 amend notes (2011).

20100991-CA                            14

doing it are not servants.'"  *Dowsett v. Dowsett*, 116 Utah 12, 207 P.2d 809, 811 (1949) (emphasis omitted) (quoting Restatement (First) of Agency § 220 cmt. c (1933)); *see also* Restatement (Second) of Agency § 2 (1958) ("A servant is an agent . . . whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.").

¶36    If Defendants were acting merely as independent contractors for Provo City, they are not entitled to assert immunity under the GIAU, even though they were acting as its agents in the broad sense.  *See* Utah Code Ann. § 63G-7-102(2)(c).  Under those circumstances, Defendants would not be protected by the GIAU and Mallory's failure to file a notice of claim would not divest the trial court of jurisdiction.  Thus, Defendants must establish that they were acting as agents under the control of Provo City with respect to traffic control, i.e. as servants.

III.  The Record Contains Insufficient Evidence to Determine Whether the City Retained Control over Defendants.

¶37    Because this matter comes to us on a motion to dismiss, we must determine if the issue of whether Defendants were servants of Provo City can be answered as a matter of law based on the Complaint and the affidavits provided to the trial court.  *See Wheeler v. McPherson*, 2002 UT 16, ¶¶ 9, 20, 40 P.3d 632.  If it cannot, the dismissal was premature and the case must be remanded to the trial court for further proceedings.  *See Spoons v. Lewis*, 1999 UT 82, ¶ 7, 987 P.2d 36.  Accordingly, we focus our review on whether the facts asserted in the Complaint, together with the affidavits, establish that Provo City retained control over Defendants' traffic direction activities.  *See Dowsett*, 207 P.2d at 811; *see also* Restatement (Second) of Agency § 2 (1958).

¶38    Non-peace officers employed by BYU are allowed by ordinance to direct traffic on public streets "to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people" if the non-peace officers are supervised by a university peace officer.  *See* Provo City, Utah, Code § 9.10.060.  The affidavit of Peace Officer states that "University Police has been certified . . . as a law enforcement agency according to the rules of the Department of Public Safety."  The affidavit also indicates that "University Police trains all of its student traffic cadets extensively in proper traffic direction."  Peace Officer's second affidavit provides information relating to his supervision of Robinson on the day of the accident.  This evidence appears sufficient to support the conclusion that Robinson's direction of traffic was supervised by a BYU peace officer, and was therefore permitted by the ordinance.  However, it is insufficient to show whether Defendants were acting as servants, rather than independent contractors, of

20100991-CA                    15

Provo City, and were therefore Employees covered by the GIAU. The record before us provides no information about the control, if any, exercised by Provo City over the manner in which Defendants performed traffic control activities. For example, the record does not establish whether Provo City had any role in developing BYU's traffic direction program, provided any oversight of that program, or imposed requirements for the hiring, training, or supervision of cadets. As a result, there is insufficient evidence to establish whether Defendants were acting as Employees of Provo City.

¶39 Accordingly, we conclude that the case was dismissed prematurely and remand to the trial court for further proceedings to determine whether Defendants are entitled to the protections of the GIAU.[10] If the trial court determines that Provo City did not retain control over Defendants, then the court has subject matter jurisdiction. Otherwise, the GIAU and its notice of claim provision applies.

### IV. Venue Was Properly Transferred to Utah County.

¶40 We next consider Mallory's challenge to the change of venue because it will affect the proceedings on remand. The Utah Legislature has provided that civil cases are to be "tried in the county in which: (a) the cause of action arises; or (b) any defendant resides at the commencement of the action." Utah Code Ann. § 78B-3-307(1) (2008). Venue can be changed "when the convenience of witnesses and the ends of justice would be promoted by the change." *Id.* § 78B-3-309(3). Defendants requested a change of venue under Utah Code section 78B-3-309(3), based on the "convenience of witnesses" and "the ends of justice." The Third District Court granted Defendants' request for change of venue to the Fourth District because all defendants reside in Utah County and the accident occurred in Utah County. "Although we will not disturb a trial court's ruling on a motion to change venue absent a clear abuse of discretion, we will reverse if the decision exceeds the bounds of reasonability." *See Durham v. Duchesne Cnty.*, 893 P.2d 581, 582 (Utah 1995) (citation omitted).

---

10. Mallory also challenges the constitutionality of the GIAU as applied in this case. We first note that these claims are inadequately briefed. *See* Utah R. App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on."). Furthermore, because we have remanded this matter to the trial court so that issues related to the applicability of the GIAU to these proceedings can be determined, any discussion of the due process or First Amendment implications of cloaking Defendants with immunity would be premature.

¶41 Mallory asserts that the convenience of the witnesses did not mandate a change of venue. In the trial court and in the briefs with this court, he asserted that forty percent of his treating doctors and two other potential witnesses reside in Salt Lake County.[11] However, Mallory did not indicate how many treating doctors were involved or were expected to testify. Nor did Mallory otherwise challenge Defendants' position that Utah County is the more convenient forum because "[t]he cause of action, all named parties [including Mallory], the investigating police officer, and the majority of the witnesses all reside in Utah County."

¶42 Mallory further complains of BYU's prominence in Utah County and raises concerns about empaneling an impartial jury there.[12] While Mallory expressed general concerns about potential bias in the Utah County jury pool, "[a] trial court does not abuse its discretion" by denying a motion for change of venue when "allegations of bias" are based on mere "conjecture." *See City of Grantsville v. Redevelopment Agency*, 2010 UT 38, ¶ 53, 233 P.3d 461 (internal quotation marks omitted). This is because trial tools such as voir dire provide an "opportunity to weed out potentially biased jurors." *See id.*

¶43 Ultimately, the Third District Court determined that Utah County was more convenient because the accident occurred in Utah County and all of the defendants resided there. We cannot conclude that the Third District Court's decision exceeded the bounds of reasonableness.

---

11. At oral argument, Mallory for the first time asserted that of the eleven potential witnesses, five reside in Salt Lake County. Because Mallory did not brief this argument, we decline to address it. *See Workers Comp. Fund v. Argonaut Ins. Co.*, 2011 UT 61, ¶ 9 n.2, 266 P.3d 792.

12. For the first time on appeal, Mallory also asserts that Judge Laycock "was a graduate of BYU . . . and her husband was employed at BYU." We do not address this issue of alleged bias because Mallory affirmatively assented to going forward with the May 10, 2010 hearing on the motion to dismiss after Judge Laycock provided a detailed account of her association with BYU, including that she has friends and relatives employed as BYU faculty. *See, e.g., State v. Rudolph*, 970 P.2d 1221, 1230 (Utah 1998) (holding that where the defendant "stated that he wanted the trial to proceed" before the same trial judge who was the subject of his earlier motion to recuse, he waived his right to object to the judge's participation in the matter); *Lunt v. Lance*, 2008 UT App 192, ¶ 12, 186 P.3d 978 ("[P]arties may waive disqualification of a judge otherwise disqualified . . . if, after disclosure of the basis for disqualification, the parties consent to the judge's continued participation in the proceeding.").

CONCLUSION

¶44    Defendants' motion to dismiss for lack of subject matter jurisdiction was not converted into a motion for summary judgment.  However, because of uncertainty regarding the facts relevant to subject matter jurisdiction, dismissal of the action was premature.  Accordingly, we remand to the Fourth District Court to conduct the proceedings it deems appropriate to resolve those issues.  We also affirm the Third District Court's order transferring venue to the Fourth District Court for the convenience of the witnesses and parties.

¶45    Affirmed in part, reversed and remanded in part.


_____
Carolyn B. McHugh,
Presiding Judge


                                                  -----


¶46    WE CONCUR:


_____
J. Frederic Voros Jr.,
Associate Presiding Judge


_____
Michele M. Christiansen, Judge